**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

KENDALL WALKER,

                                        Plaintiff,

            v.

DANIEL MARTUSCELLO, et al.,                    No. 9:18-CV-1189
                                                (BKS/CFH)

                                        Defendants.

**APPEARANCES:**

Kendall Walker
Plaintiff pro se


Attorney General for the                    ERIK BOULE PINSONNAULT, ESQ.
State of New York                           Assistant Attorney General
The Capitol
Albany, New York 12224
Attorney for Defendants

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

## REPORT-RECOMMENDATION AND ORDER[1]

    Plaintiff pro se Kendall Walker ("plaintiff"), a former inmate[2] and a member of the

Nation of Islam ("NOI"), who was, at all relevant times, in the custody of the New York

State Department of Corrections and Community Supervision ("DOCCS"), brings this

action pursuant to 42 U.S.C. § 1983, alleging that defendants, Coxsackie Correctional

---

[1] This matter was referred to the undersigned for Report-Recommendation and Order pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

[2] The DOCCS's inmate locator website (http://nysdoccslookup.doccs.ny.gov/, Department ID Number 07A6883), indicates that plaintiff was conditionally released to parole supervision on March 23, 2021, and that he submitted a change of address showing a private address effective as of April 2, 2021. See Dkt. No. 52.

Facility ("Coxsackie") Superintendent, Daniel Martuscello ("Supt. Martuscello");

Coxsackie Deputy Superintendent of Programs, David Barringer ("Barringer"); and

Chaplain Grover T. Reddie ("Father Reddie")—who, at all relevant times were employed

by DOCCS— violated his constitutional rights under the First and Fourteenth

Amendments.  See Dkt. No. 1 ("Compl.") at 9.

## I. Background

## A. Relevant Procedural History

Plaintiff commenced this pro se civil rights action pursuant to 42 U.S.C. § 1983

by filing his Complaint on October 2, 2018.  See Dkt. No. 1 ("Compl.").  In lieu of filing

an answer, defendants moved to dismiss the complaint pursuant to Federal Rule of Civil

Procedure ("Fed. R. Civ. P.") 12(b)(6).  See Dkt. No. 14.  On December 9, 2019, the

undersigned issued a Report-Recommendation & Order recommending that

defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ.

P.") be denied as to the following of plaintiff's claims against Supt. Martuscello,

Barringer, and Father Reddie: (1) First Amendment Free Exercise Clause claims based

on the alleged (a) denial of Jumu'ah[3] services to NOI inmates at Coxsackie C.F. in

2015; (b) the rescheduling of the Coxsackie C.F. Saviour's Day celebration in October

2015; and (c) the scheduling of Jumu'ah services in 2016 in the morning rather than in

the afternoon; and (2) Fourteenth Amendment Equal Protection clause claims based on

(a) the failure to provide NOI inmates with Friday Jumu'ah services, whereas Sunni

---

[3]  As defendants point out in their memorandum of law in support of their motion for summary judgment,
numerous spelling variations of Jumu'ah can be found in the papers in this lawsuit.  See Dkt. No. 44-1 at
6 n. 3.  For the sake of consistency, the undersigned will use the spelling "Jumu'ah" throughout this
Report-Recommendation & Order.

Muslims were allowed to participate in a weekly Jumu'ah service; and (b) denial of showers to NOI inmates prior to Jumu'ah service, whereas Sunni Muslims were allowed to shower prior to their weekly congregational prayer service. <u>See</u> Dkt. No. 33 at 16-19, 21-22, 25-27, 31.[4]

The undersigned recommended that defendants' motion to dismiss be granted as to plaintiff's remaining claims and an additional defendant. <u>See id.</u> at 31. On January 13, 2020, United States District Judge Brenda K. Sannes adopted the Report-Recommendation in its entirety, and granted plaintiff leave to file an amended complaint to cure the deficiencies in the Complaint. <u>See</u> Dkt. No. 24 at 3. Plaintiff did not file an amended pleading. On February 26, 2020, defendants filed an answer to the complaint. <u>See</u> Dkt. No. 35.

Following the close of discovery, defendants filed their presently pending motion for summary judgment pursuant to Fed. R. Civ. P. 56 to dismiss complaint in its entirety. <u>See</u> Dkt. No. 44. Plaintiff filed a response in opposition to the motion, <u>see</u> Dkt. No. 50, and defendants filed a reply. <u>See</u> Dkt. No. 51. For the reasons that follow, it is recommended that defendants' motion for summary judgment be granted in part and denied in part.

---

[4] The Court granted defendants' motion to dismiss as to plaintiff's First Amendment Free Exercise Clause claim based on the cancellation of NOI's Jumu'ah service on May 27, 2016—for lack of personal involvement of any of the named defendants. <u>See</u> Dkt. No. 33 at 20-21; Dkt. No. 34 at 2, 3. As noted above, plaintiff did not submit an amended pleading in this action. Therefore, to the extent that the December 2019 Report-Recommendation stated that plaintiff plausibly asserted a Fourteenth Amendment Equal Protection Clause claim based on the cancelation of the May 27, 2016 Jumu'ah service, that claim too must be dismissed for lack of personal involvement of any of the named defendants. <u>See</u> Dkt. No. 33 at 25, 31; <u>see also</u> <u>Wright v. Smith</u>, 21 F.3d 496, 501 (2d Cir. 1994) ("It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" (quoting <u>Moffitt v. Town of Brookfield</u>, 950 F.2d 880, 885 (2d Cir. 1991))). The undersigned notes also that neither plaintiff nor defendants address any such equal protection claim in their submissions on the present motion.

**B. Plaintiff's Factual Assertions and Claims[5]**

The facts are reviewed in the light most favorable to plaintiff as the non-moving party.  See subsection III., infra.  At all relevant times, plaintiff was confined at Coxsackie C.F.  See Compl.

**1. Jumu'ah Services in 2015**

Plaintiff, a former inmate who was incarcerated at Coxsackie C.F. beginning in 2015, is a Muslim who practices as a member of the NOI.  See Compl. at 6, 7.  As Muslims, NOI adherents are "mandated" to observe a weekly congregational prayer service called Jumu'ah on Friday afternoons.  Id. at 6.  Prior to 2016, Coxsackie C.F. provided other Muslim inmates weekly Jumu'ah services, but did not provide such services for NOI members.  See id. at 6.  Coxsackie C.F.'s 2013 Ministerial Services calendar, prepared by Father Reddie, listed Jumu'ah services under the subheading "Muslim – Dr. Imam Ali"[6] from 12:30 p.m. to 2:30 p.m. on Friday.  See Dkt. No. 1-1 at 14.  The 2013 Ministerial Services calendar also listed "NOI Class/Islamic Class" under the separate subheading "Nation of Islam – Father Reddie" from 6:00 p.m. to 8:00 p.m. on Tuesday.  See id.

---

[5] To the extent that plaintiff's exhibits are relevant to the causes of action at issue on the present motion, the Court will consider them as part of the Complaint.  See Sira v. Morton, 380 F.3d 57, 67 (2d Cir. 2004) ("A complaint is deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are integral to the complaint." (internal quotation marks and citations omitted)).

[6] On January 13, 2020, the Court dismissed plaintiff's Complaint insofar as asserted against Dr. Ali for failure to state a claim, and pursuant to Fed. R. Civ. P. 4(m) for failure to serve Dr. Ali.  See Dkt. No. 34 at 3.

At some point in early- to mid-2015, plaintiff and NOI inmate facilitator Anthony

Hill ("Hill"), sent Barringer an undated letter, cc'ing Father Reddie, in which Hill raised

numerous issues on behalf of the NOI inmates at Coxsackie C.F., including the lack of

Jumu'ah services.  See Compl. at 6; Dkt. No. 1-1 at 4, 7.  Although the letter is undated,

plaintiff states that he sent it to Barringer and Reddie in "[a]pprox. March 2015."  Compl.

at 6.  The letter indicates that the NOI inmates addressed the letter to Barringer,

because they previously "went to . . . Father Reddie[,]" but did "not feel [they we]re

being treated fair and equal under the laws and directives of the State of New York."

Dkt. No. 1-1 at 2.  Concerning Friday Jumu'ah services, the letter states:

> The, N.O.I., community will like to observe a religious
> worship service and congregational prayer of [Jumu'ah]
> Friday as the whole Islamic world is observing.  The whole
> entire Islamic world of orthodox Muslims and, N.O.I.,
> Muslims are practicing their Islamic worship through their
> belief and guidance of the, Holy Quran.  [Jumu'ah] Friday
> prayer is a ritual-tradition and practice by "ALL" Muslims
> worldwide.  Congregational prayer on Friday is a very
> important part of the spiritual growth and development of the,
> N.O.I.[]  If possible, can we sit down and address this
> concern[?]

Id. at 4.

On June 19, 2015, non-party DOCCS Deputy Commissioner for Program

Services, Jeffery McCoy ("McCoy"), issued a response to the undated letter, which he

addressed to Hill.  See Dkt. No. 20-1 at 2.  McCoy indicated that Coxsackie C.F. "was

contacted regarding [NOI's] allegation and concerns," and stated that Coxsackie C.F.

staff informed him "that the Coordinating Chaplain [wa]s working with the NOI adherents

to address religious needs."  Id.  Further, McCoy stated that "[i]t was reported that . . .

worship services for the NOI adherents [we]re being held on Tuesday evenings, in order

to ensure staff coverage." Id. Moreover, McCoy informed Hill that

> All additional religious concerns should be addressed to the
> Coordinating Chaplain, and if you are not satisfied with the
> outcome, address said concerns with the Deputy
> Superintendent for Program Services. If you are still not
> pleased, you may address your concerns to the
> Superintendent. You may also use the grievance process if
> your concerns are not resolved.

Id. McCoy's response cc'd "Superintendent, Coxsackie CF"; "DSP, Coxsackie CF"; and

"Chaplain, Coxsackie C.F." Id. at 3.

On October 19, 2015, plaintiff filed Grievance No. CX-18704-15, see Dkt. No. 1-1

at 19; Dkt. No. 44-6 at 34,[7] which plaintiff states "express[ed] how his First Amendment

rights were being violated by not being able to participate in a N.O.I. [Jumu'ah]

service/congregational prayer service while . . . at Coxsackie [C.F.]" Compl. at 7. This

grievance was consolidated with a grievance filed by other NOI inmates. See Dkt. No.

1-1 at 19, 25.

In a letter dated November 21, 2015, addressed to another NOI inmate, Supt.

Martuscello responded to the NOI inmates' letters regarding "Day Time Jumu'ah

Services." Dkt. No. 1-1 at 23. Supt. Martuscello stated that, "[o]n this matter of a 'Day

time [Jumu'ah] Service: Ministerial Services Religious Calendar makes no

accommodation for, or reference to, a [Jumu'ah] Service for the N.O.I. religious

Community." Id. On December 23, 2015, the Inmate Grievance Resolution Committee

("IGRC") issued a response to consolidated Grievance No. CX-18704-15, which

---

[7] As defendants' submissions clarify, this grievance, dated October 13, 2015, complains that an October 13, 2015 NOI class was cancelled, but does not mention Jumu'ah service. See Dkt. No. 44-6 at 34.

indicated that "the actions requested by the [g]rievant are [a]ccepted.  Central Office has

approved N.O.I. for congregate services on Friday mornings in the facility Chapel

Annex, starting 1/8/16."  Id. at 25.

On January 28, 2016, Supt. Martuscello denied the consolidated grievance (CX-

18704-15).  See Dkt. No. 1-1 at 21.  Supt. Martuscello's response indicated that the title

of the grievance was "Daytime Callout issue," and stated that "[t]he [g]rievants allege

that they are being discriminated against due to their religion, and that they are not

being afforded daytime services."  Id.  As relevant here, Supt. Martuscello found that no

discrimination or staff malfeasance had occurred, but noted:

> All religious services are governed by central office.  There
> was no accommodation for the N.O.I. faith to have a daytime
> service in the 2015 DOCCS religious calendar.  However, it
> is noted that the facility has been notified by central office
> that accommodations have been made for the 2016
> calendar, and that the N.O.I. faith will receive services in the
> Chapel Annex starting 1/8/16 from 8:30-9:30 A.M.

Id.

Liberally construed, the complaint alleges that defendants violated plaintiff's First

Amendment right to free exercise of religion by failing to provide NOI inmates with

Jumu'ah services in 2015.  See Compl. at 6, 7, 9.  Plaintiff also asserts a Fourteenth

Amendment Equal Protection Clause claim based on Coxsackie C.F.'s provision of

Jumu'ah service to Orthodox Muslim inmates, but not N.O.I. inmates, in 2015.  See id.


### 2. Saviour's Day Celebration 2015

On October 6, 2015, plaintiff and other NOI inmates attended the weekly

Tuesday night NOI class led by Father Reddie.  See Compl. at 6.  Plaintiff states that he

and his fellow NOI members were "preparing to observe" "Saviour's Day on October 7, 2015," which is a celebration of Muhammad's birthday.  Id.  Father Reddie informed the NOI inmates "that he made no accommodations for registered members of the N.O.I. to congregate together and celebrate this Holy Day on October 7, 2015."  Id.  On October 8, 2015, plaintiff filed Grievance No. CX-18698-15, which was later consolidated, complaining that "Father Reddie [wa]s in violation of . . . Directive # 4202 [for] denying [plaintiff his] right to practice a religious holy day on October 7, 2015[,] of the [NOI]." Dkt. No. 1-1 at 15.  Plaintiff explained that Saviour's Day "is recognized on the religious calendar for holy day given to[] Father Reddie[] by the Deputy Commissioner for Program Services[,]" Barringer.  Id.

In its response to plaintiff's consolidated grievance (CX-18698-15), the IGRC acknowledged that October 7, 2015, "Saviour's Day," is a "holy day," which "is noted on the facility events calendar as required by Section VII(A) of DOCCS Directive No. 4202, 'so that all groups are afforded the designated accommodations.'"  Dkt. No. 1-1 at 16. The IGRC further "found that the N.O.I. was not afforded the opportunity to observe said holy day" and "recommended that Directive 4202 be adhered to by facility staff in that any future deviations from observance of holy days are done so in accordance with Directive 4202 in that they acquire approval from Central Office for any deviations."  Id. On August 24, 2016, the CORC issued a decision concerning consolidated Grievance No. CX-18698-15 in which it "note[d] that the 10/7/15 NOI Holy Day event was rescheduled for 10/24/15 due to a lack of space at the facility to hold it on its appropriate date."  Id. at 17.  The CORC "further note[d] that the Division of Ministerial, Family and Volunteer Services was not contacted prior to the event being rescheduled[,]" and

"assert[ed] that prior to the dates of a religious event being changed the Division of Ministerial, Family and Volunteer Services must be notified."  Id.

Liberally construed, the Complaint alleges that defendants violated plaintiff's constitutional rights under the First Amendment Free Exercise Clause by rescheduling the 2015 Saviour's Day event to a date after October 7, 2015.  See Compl. at 6, 9.

### 3. Timing of 2016 Jumu'ah Services and Availability of Pre-Service Showers

Plaintiff states that Jumu'ah "prayer service is mandated for 'ALL' Muslims . . . every week especially on Friday afternoons."  Compl. at 6.  On January 15, 2016 plaintiff filed Grievance No. CX-18787-16, which was later consolidated, complaining, as relevant here, that NOI's Jumu'ah services were held in the morning instead of the afternoon "according to the teachings of the Holy Quran."  Dkt. No. 44-6 at 50; see id. at 51.  Plaintiff also stated that he "asked Mr. Barringer if . . . N.O.I. c[ould] receive showers before [their] service[,]" and that Barringer responded by stating that "showers will not happen for the Nation of Islam."  Id. at 50.  Further, Grievance No. CX-18787-16, referenced a "memorandum" dated "March 9th, 2012 with the subject, 'N.O.I. Showers," which plaintiff averred "clearly state[d], '[a]s a reminder, prior to the . . . N.O.I. services, all inmates attending such service will be allowed to shower.'"  Id.  In addition, Grievance No. CX-18787-16 stated that "[t]he Sunni Muslim community are allowed to shower before their service[,]" and, that plaintiff's "rights are protected under the Fourteenth Amendment because we as the [NOI] are Muslims."  Id. at 51.  Plaintiff argues that "this [2012] memorandum show[s] the [NOI] did have services at one time at Coxsackie C.F."  Compl. at 7.

On February 24, 2016, Supt. Martuscello denied Grievance No. CX-18787-16 on the basis that it was "without merit." Dkt. No. 1-1 at 32. Supt. Martuscello explained, in relevant part, that Coxsackie C.F. had "gained approval from Central Office Ministerial Services for all elements addressed in th[e grievance,]" that "[n]o inmate [wa]s entitled to a shower before religious services, and the time . . . of the N.O.I. service is in accordance with both Central Office Ministerial Services guidelines and Directive 4202." Id. On May 25, 2016, the CORC upheld Supt. Martuscello's decision denying consolidated Grievance No. CX-18787-16. See id. at 33. In relevant part, the CORC "note[d] that [Coxsackie C.F.] consulted with the Central Office Ministerial Services prior to changing the religious service to one hour on Friday mornings." Id. Further, the "CORC assert[ed] that inmates are not entitled to shower prior to religious services, however, it is acceptable to wash the morning of the service." Id. In addition, the "CORC not[ed] that the 3/9/12 memo from former DSS M . . . allowing NOI inmates to shower prior to services was rescinded." Id. Plaintiff posits that, as a "result of [G]rievance [No.] CX-18787-16, the [2012] memorandum was rescinded by . . . Barringer and . . . Martuscello . . . due to plaintiff's request for a shower before congregational prayer service. . . . to which he was clearly entitled." Compl. at 8. "Therefore," plaintiff avers, "he . . . was discriminated against by being treated differently than the members of the Orthodox [Muslim] community, who were similarly situated." Id.

Liberally construed, the Complaint alleges that defendants violated plaintiff's First Amendment right to freely exercise his religion by forcing him to participate in the Friday Jumu'ah service in the morning, rather than in the afternoon, as required by the Quran.

See Compl. at 7.  Plaintiff also alleges a Fourteenth Amendment Equal Protection claim based on the denial of showers for NOI members prior to Jumu'ah services, while similarly situated Orthodox Muslims were purportedly afforded the opportunity to shower before their Jumu'ah service.  See id. at 7, 8.

## II. Present Motion

### A.  Defendants' Memorandum of Law and Evidence

#### 1. Personal Involvement

##### a. Jumu'ah Services in 2015

###### i. Supt. Martuscello

Defendants contend that Supt. Martuscello was not personally involved in the failure to provide NOI inmates Jumu'ah services in 2015.  See Dkt. No. 44-1 at 12.  In particular, defendants aver that Supt. Martuscello lacked knowledge "that NOI mandated attendance at weekly Jumu'ah services, in addition to weekly NOI classes, until November 2015, when he received the NOI members' consolidated grievance."  Id. In support of this contention, defendants submit Supt. Martuscello's declaration in which he stated that, "[p]rior to reviewing plaintiff's November 2015 Grievance, [he] did not know that plaintiff's religion (Nation of Islam) mandated attendance at Jumu'ah services."  Dkt. No. 44-6 at 5 ¶ 17.[8]  "In response to . . . Grievance No. CX-18704-15, [Supt. Martuscello] promptly asked . . . Barringer to reach out to DOCCS Central Office

---

[8]  Supt. Martuscello appears to mistakenly refer to Grievance No. CX-18704-15 as "plaintiff's November 2015 Grievance."  Dkt. No. 44-6 at 6 ¶ 16.  However, as defendants' submissions establish, Grievance No. CX-18704-15 was dated October 13, 2015, see id. at 34, and filed on October 19, 2015.  See id. at 35.  Supt. Martuscello's letter response to the consolidated grievance is dated November 21, 2015.  See Dkt. No. 1-1 at 23.

to ascertain whether the NOI could have their congregate services on Friday mornings." Id. at ¶ 18.  Defendants also point to plaintiff's deposition testimony in which defense counsel asked plaintiff how Supt. Martuscello was advised about the lack of Jumu'ah services for NOI members in 2015, to which plaintiff replied that he "assume[d] that [Supt. Martuscello] spoke to Father Reddie or . . . Barringer who brought it to his attention.  So that's what I would assume . . . ."  Dkt. No. 44-3 at 58.  Plaintiff also testified that, "after the grievance was put in," Supt. Martuscello ensured that NOI inmates were provided with Jumu'ah service, but that "he was given the chance throughout time to correct the wrongs . . . ."  Id. at 59.  In addition, defense counsel asked plaintiff if he "kn[ew] when [Supt. Martuscello] became on notice of this . . . wrong[,]" to which plaintiff replied, "No, I don't have knowledge of when he was put on notice. . . .  But I would assume when . . . McCoy responded to the letter [on June 19, 2015,] that he was given knowledge about the issue then."  Id. at 59-60.  Defendants posit that plaintiff's speculative statements fail to establish Supt. Martuscello's personal involvement with respect to the 2015 Jumu'ah services.  See Dkt. No. 44-1 at 12.

### ii. Barringer

Defendants, relying on this Court's decision in Cantey v. Martuscello (No. 9:17-CV-284, 2019 WL 1397006 (LEK/CFH), (N.D.N.Y. Mar. 28, 2019), modified in part on reconsideration, 2020 WL 1030646 (LEK/CFH) (N.D.N.Y. Mar. 3, 2020)),[9] contend that "Berringer had no personal involvement in the alleged constitutional violations relating to the provision of Jumu'ah services to NOI adherents at Coxsackie."  Dkt. No. 44-1 at 14

---

[9]  All unpublished opinions cited in this Report-Recommendation and Order, unless otherwise noted, have been provided to plaintiff.

(citing Cantey, 2019 WL 1397006, at *14-15).  In Cantey, based on nearly identical

facts, the Court granted summary judgment dismissing the plaintiff's Fourteenth

Amendment Equal Protection claim against Barringer, holding that "a rational jury could

not infer that . . . Barringer intentionally deprived [the p]laintiff of Jumu'ah services

based on religious animus or ill will."  Cantey, 2019 WL 1397006, at *15 (internal

quotation marks and citation omitted).

Further, defendants proffer Barringer's declaration in which he states that, at all

times relevant to the claims raised in this action, he held the position of Deputy

Superintendent of Programs at Coxsackie C.F.  See Dkt. No. 44-4 at 1 ¶ 1.  In this

position, Barringer states, his "duties included generally overseeing religious programs

at the facility."  Id. at ¶ 2.  Barringer explains that "[r]eligious holidays and special events

held at Coxsackie [C.F.] are listed on an annual basis on the Coxsackie Special Events

Calendar."  Id. at 2 ¶ 3.  Moreover, Barringer states, "[w]eekly religious classes and

services are listed on DOCCS Ministerial Services Religious Calendar, . . . prepared

annually."  Id. at ¶ 5.  In addition, Barringer states that, "[i]n 2015, the Coxsackie

Ministerial Services Religious Calendar did not list Jumu'ah [s]ervices as an approved

service for the NOI community[,]" and that "Jumu'ah [s]ervices were not listed on the

Ministerial Services Religious Calendar when he took the position of Deputy

Superintendent of Programs at Coxsackie C.F. in March 2013."  Id. at 3 ¶ 7.

Defendants proffer the 2013 Ministerial Services calendar, which lists "NOI

Class/Islamic Class" on Tuesdays at 6:00-8:00 p.m., under the subheading "Nation of

Islam – Father Reddie."  Id. at 78.

Barringer states that he "became aware in November 2015 that a Grievance had been filed, and letters had been written by [plaintiff], requesting that daytime Jumu'ah services be held for the NOI community." Dkt. No. 44-4 at 3 ¶ 8. Barringer explains that, because "there was no indication on the Ministerial Services calendar that Jumu'ah services were a practice of the NOI community, [he] reached out to DOCCS Central Office by phone, and followed up by e-mail, requesting that Coxsackie [C.F.] be permitted to hold NOI services on Friday mornings." Id. Defendants proffer Barringer's November 30, 2015 email to Imam Ahmed Muhammad at DOCCS Central Office, which states, "Imam, to follow up on our conversation this morning, we would like to have a chaplain in the area when we hold NOI services. Since Imam Ali holds Muslim Services on Friday afternoons, can we hold NOI Services on Friday mornings?" Id. at 80. Imam Ahmed Muhammad responded on December 1, 2015, stating, in relevant part, that he had "contacted Director Morris and it [wa]s agreed that the NOI can have their congregation services on Friday mornings. I thank Supt[.] Martuscello and you for the positive deliberation on this matter." Id. Thereafter, on December 18, 2015, Barringer emailed personnel at DOCCS stating, "effective 1/8/16 NOI services will be held in the Chapel Annex on Friday mornings from 8:30-9:30 AM." Id.

### iii. Father Reddie

Defendants, relying on Cantey, contend that "Father Reddie was not personally involved in the allegedly belated accommodation of Jumu'ah service for NOI members at Coxsackie, because he did not have the authority to establish congregate services not listed on the Ministerial Services Religious Calendar and required approval by

DOCCS Central Office[.]"  Dkt. No. 44-1 at 14 (citing <u>Cantey</u>, 2020 WL 1030646, at *4-5).  Defendants contend that, Father Reddie's authority as coordinating chaplain, was limited, pursuant to DOCCS Directive 4202, to "coordinating the various religious functions at [Coxsackie C.F.] and overseeing and monitoring the religious programs offered at the facility."  Dkt. No. 44-1 at 14 (citing DOCCS Directive 4202 § V, reproduced at Dkt. No. 44-4 at 15 (Exhibit 2 to Barringer Declaration)).  However, defendants aver, as the Court held in <u>Cantey</u>, Father Reddie did not have "the power to set up Jumu'ah services for NOI inmates at Coxsackie [C.F.,]" and was not in a "'supervisory role such that he could affect the superintendent's decision to provide plaintiff with Jumu'ah services.'"  <u>Id.</u> at 14-15 (quoting <u>Cantey</u>, 2020 WL 1030646, at *4). Thus, defendants contend, as in <u>Cantey</u>, the Court should dismiss plaintiff's First Amendment Free Exercise Clause claim against Father Reddie based on the lack of Jumu'ah services for NOI inmates at Coxsackie in 2015 for lack of personal involvement.  <u>See id.</u> at 15 (citing <u>Cantey</u>, 2020 WL 1030646, at *4).

### b. Rescheduling of the October 2015 Saviour's Day Celebration—Supt. Martuscello[10]

Defendants contend that Supt. Martuscello was not personally involved in the decision to reschedule the October 2015 Saviour's Day celebration.  <u>See</u> Dkt. No. 44-1 at 13.  Defendants posit that "the decision to reschedule the event due to lack of space at the facility on the date set in the Events Calendar was made following discussions between . . . Barringer and Father Reddie."  <u>Id.</u>  In support of their argument,

---

[10]  Defendants do not controvert Father Reddie's and Barringer's personal involvement in the decision to reschedule the October 2015 Saviour's Day celebration.  <u>See</u> Dkt. No. 44-1 at 14, 15.

defendants cite Barringer's affidavit in which he states that "[t]he Saviour's Day religious holiday was scheduled for October 7, 2015 as a [NOI] special event on the 2015 Coxsackie Special Events Calendar."  Dkt. No. 44-4 at 2; see id. at 10 (2015 Coxsackie Special Events Calendar, listing Saviour's Day as a NOI special event on October 7 from 12:30-5:30 p.m.).  Barringer further states that, "[p]rior to October 7, 2015, [he] was made aware by Father Reddie that there was a lack of space at the facility for all of the events scheduled at Coxsackie C.F. on that date."  Id. at 2 ¶ 6.  Barringer states that he "requested that Father Reddie ask the NOI [c]ommunity to re-schedule the Saviour's Day [e]vent."  Id.  Although not present during Father Reddie's conversation with NOI adherents, Barringer states that "it was [his] understanding that they conferred and the inmate facilitators for the NOI community consented to holding the event on another date[,]" and that the event was "rescheduled and held on October 24, 2015."  Id.

Defendants also cite Father Reddie's declaration in which he states that, "[p]rior to October 7, 2015, [he] advised . . . Barringer . . . that there was a lack of space at the facility" "due to a large number of events  . . . scheduled for that date[.]"  Dkt. No. 44-5 a 2 ¶ 5.  Father Reddie states that he conferred with Barringer, who "requested that [he] ask the NOI [c]ommunity to re-schedule the Saviour's Day [e]vent."  Id. at ¶ 6.  Father Reddie indicates that, "[o]n October 6, 2015, during the NOI study class, [he] conferred with members of the NOI community about the need to reschedule the event."  Id. Father Reddie acknowledges that he and the NOI adherents "had difficulties agreeing on a new date, because [he] had to be away from the facility October 12-15, 2015," but that "the inmate facilitators did agree to have the [Saviour's Day] event re-scheduled for another day[,]"—October 24, 2015.  Id.   Thus, defendants posit, Supt. Martuscello had

16

no direct involvement in the decision to reschedule the October 2015 Saviour's Day event—a decision made by Father Reddie and Berringer with the approval of the NOI inmates. See Dkt. No. 44-1 at 13. In addition, defendants aver that Supt. Martuscello did not handle plaintiff's October 8, 2015 grievance (Grievance No. CX-18698-15); rather, defendants note, Supt. Martuscello "designated Deputy Supt[.] Lotz to issue a decision[]" on that grievance. Id.

## 2. First Amendment Free Exercise Claims - Merits

### a. Jumu'ah Services in 2015

Defendants do not dispute that Coxsackie C.F. did not provide Jumu'ah services to NOI members in 2015. Dkt. No. 44-1 at 17. However, defendants note, "[p]laintiff and other NOI members began advancing their request of Jumu'ah services in May 2015 and, consistent with . . . McCoy's suggestion, utilized the grievance process to do so." Id. Moreover, defendants aver, plaintiff's consolidated grievance was ultimately successful and resulted in Coxsackie C.F. providing Jumu'ah services for NOI adherents in 2016. See id. "Under these circumstances," defendants argue, "plaintiff can not demonstrate a substantial burden or, alternatively, that any such burden was de minimis." Id.

### b. Rescheduling of the October 2015 Saviour's Day Celebration

Defendants argue that the rescheduling of the October 2015 Saviour's Day celebration for NOI inmates was "based on lack of space at the facility," and note that "at least some NOI members ultimately agreed to Father Reddie's request to

reschedule," and that some NOI members participated in the event on October 24, 2015. Dkt. No. 44-1 at 17. Defendants cite the portion of plaintiff's deposition testimony in which he confirmed that the October 2015 Saviour's Day event was "ultimately rescheduled," and that "other [NOI adherents attend[ed]" the rescheduled event, but that plaintiff did not attend. Dkt. No. 44-3 at 64-65. Plaintiff also testified at deposition that "[t]he primary disagreement" concerning the October 2015 Saviour's Day event was that Father Reddie "wasn't able to produce the packet that he was supposed to submit to prepare [NOI's] holy day," which resulted in the event having to be postponed. Id. at 64. However, defendants point to Barringer's and Father Reddie's declarations in which they state that the October 2015 Saviour's Day event was rescheduled due to lack of space in the facility, "not due to Father Reddie neglecting to file the necessary paperwork to schedule the event." See Dkt. No. 44-4 at 2 ¶ 6; Dkt. No. 44-5 at 2 ¶ 5. Thus, defendants contend that "there were logistical and penological reasons for both the re-scheduling of the Saviour's Day event and delay in modifying the Religious Calendar to add Friday Jumu'ah services for NOI." Dkt. No. 44-1 at 17-18. Defendants cite Graham v. Mahmood (No. 5-CV-10071 (NRB), 2008 WL 1849167 (S.D.N.Y. Apr. 22, 2008)) for the proposition that "it is clear that providing for administrative support and security for religious (or other) meetings imposes a burden on prison staff . . . . In addition, allowing NOI members to meet more frequently than once per week could burden the rights of other groups due to space constraints." Dkt. No. 44-1 at 17 (quoting Graham, 2008 WL 189167, at *13).

### c. Timing of 2016 Jumu'ah Services

Defendants aver that the scheduling of Jumu'ah in 2016 services in the morning did not violate plaintiff's First Amendment free exercise rights. <u>See</u> Dkt. No. 44-1 at 22. In support of this contention, defendants point to the portion of plaintiff's deposition testimony in which he stated that Jumu'ah services are "supposed to be held from noon to two o'clock, because there's a certain prayer that comes during that time where the congregation is supposed to pray together during that service. It's the early afternoon prayer." Dkt. No. 44-3 at 31. Plaintiff further testified that, "during the springtime, summertime, the hours will go up and the hours will go back," so that the appropriate time to hold the Jumu'ah service would be about "maybe about twelve—twelve thirty to one o'clock. But when the time goes back, it would be within the ten thirty to eleven thirty range." <u>Id.</u> Plaintiff agreed with counsel that "sometimes [Jumu'ah is] in the late morning." <u>Id.</u> Further, defendants contend that plaintiff did not "explicitly state that his causes of action were premised upon the 2016 Jumu'ah services for NOI members being scheduled in the morning"; therefore, defendants urge, "plaintiff is not pressing a claim based on the timing of Jumu'ah services for NOI members and any such claim should be dismissed." <u>Id.</u> at 23. "Alternatively," defendants aver, based on plaintiff's deposition testimony concerning the timing of Jumu'ah services, "the decision to provide Jumu'ah services on Friday mornings rather than Friday afternoon—in order to allow a chaplain to be present for the NOI Jumu'ah services—constitutes, at most, a de minimis burden." <u>Id.</u>

### 3. Fourteenth Amendment Equal Protection Claims

#### a. Supt. Martuscello and Barringer

19

Defendants contend that, as in <u>Cantey</u>, Supt. Martuscello was not aware that NOI members required Jumu'ah services prior to November 2015—when he responded consolidated Grievance No. CX-18704-15.  Dkt. No. 44-6 at 4-5 ¶¶ 13-17.  Defendants also aver that plaintiff's deposition testimony as to when Supt. Martuscello was placed on notice of the issue of NOI Jumu'ah services was speculative and fails to establish that Supt. Martuscello became aware of the issue prior to November 2015.  <u>See</u> <u>id.</u> (citing Dkt. No. 44-3 at 58).  Further, defendants aver, Barringer, as Deputy Supervisor of Programs, "was constrained to follow the Religious Calendar issued by Ministerial Services, and did not have unilateral authority to establish Jumu'ah services."  Dkt. No. 44-1 at 19.  Therefore, defendants contend, it is "undisputed . . . that Jumu'ah services were not on the Religious Calendar when [Barringer] took the position of [Deputy Supervisor of Programs] in 2013, [or] on the 2015 Calendar."  <u>Id.</u>  Moreover, defendants posit that, "even if Barringer actually received the letter from [] Hill on or about June 19, 2015, 'his responsibility for religious programs at Coxsackie [C.F.] was supervisory . . . [and] he was not responsible for addressing inmates' request in the first instance.'"  <u>Id.</u> (quoting <u>Cantey</u>, 2019 WL 1397006, at *14).  Thus, defendants urge, Barringer lacked the authority to accommodate plaintiff's requests for Jumu'ah services such that he could not have intentionally deprived plaintiff of such services on the basis of religious animus.  <u>See</u> <u>id.</u>  In any event, defendants cite Supt. Martuscello's and Barringer's declarations in which they both deny ever treating plaintiff differently than any other similarly situated inmates, and state that "[n]one of the actions taken with respect to Jumu'ah services or the rescheduling of the Saviour's Day event were based on [p]laintiff's membership in NOI."  Dkt. No. 44-4 at 4 ¶ 9; Dkt. No. 44-6 at 7 ¶ 27.

### b. Reddie

Defendants contend that plaintiff's Fourteenth Amendment Equal Protection claims against Father Reddie fail on the merits.  See Dkt. No. 44-1 at 20.  In support of their motion for summary judgment, defendants proffer Father Reddie's declaration in which he states that he did not treat plaintiff differently than other similarly situated inmates, and that none of his actions with respect to providing Jumu'ah services or the October 2015 Saviour's Day celebration were motivated by plaintiff's affiliation with NOI. Dkt. No. 44-5 at 4 ¶ 12.  Rather, Father Reddie states, "there were logistical and penological reasons for the re-scheduling of the [S]aviour's [D]ay event and the time it took to get permission from DOCCS [C]entral [O]ffice to establish Friday Jumu'ah services."  Id.  Moreover, in his declaration, Father Reddie states that "[s]imilarly situated inmates who are members of other religious groups have also been subject to a weighing of facility resources and penological interests prior to the scheduling of their events."  Id.  Thus, defendants urge, "a rational jury could not infer that [Father] Reddie intentionally deprived plaintiff of Jumu'ah services, or permitted rescheduling of the Saviour's Day event, based on a religious animus or ill-will."  Dkt. No. 44-1 at 20 (internal quotation marks and citations omitted).


### c. Equal Protection Claim Regarding Pre-Jumu'ah Showers

Defendants argue that plaintiff only "described his concern about showers before Jumu'ah services and his general concern that each religious community be treated with equality" "[w]hen specifically asked about his claim that NOI adherents were treated

unequally as compared to Orthodox Muslims" at his deposition.  Dkt. No. 44-1 at 23.  In addition, defendants take the position that plaintiff's "claim based on lack of showers before Jumu'ah services was [previously] dismissed."  Id. at 23 n. 7.

### 4. Qualified Immunity

Defendants contend that they are entitled to qualified immunity "because NOI adherents received weekly religious classes and the issue of lack of Jumu'ah services was not raised until relatively shortly before [Supt.] Martuscello and Barringer sought permission from DOCCS Central Office to provide Jumu'ah services," and since "the Saviour's Day even was not cancelled, but merely rescheduled[.]"  Dkt. No. 44-1 at 21. Defendants posit that the present matter "is sufficiently distinguishable from precedent that an outright refusal to allow prisoner [sic] to attend a religious feast violated the First Amendment [F]ree [E]xercise [C]lause to warrant qualified immunity."  Id. a 21-22.

### B. Plaintiff's Response in Opposition

Plaintiff avers that Barringer's, Father Reddie's, Supt. Martuscello's declarations are incorrect insofar as they state that the Ministerial Religious Calendar lists each religious group with a schedule of when weekly religious classes and services are held. See Dkt. No. 50-1 at 4 (citing Dkt. No. 44-4 at 2 ¶ 5; Dkt. No. 44-5 at 3 ¶ 9; Dkt. No. 44-6 at 4 ¶¶12-13).  Plaintiff asserts that "[t]he religious groups that were given a weekly mandated religious service at Coxsackie were not listed in the 2015 Ministerial Religious Calendar to have a weekly religious service."  Id.  Further, plaintiff argues that NOI was not accommodated with a weekly religious service in 2015, despite the 2015

"Ministerial Service Religious Calendar" providing "accommodations for the NOI religious group to hold a weekly mandated religious worship service." Id. at 7.  Citing to "Exh. 3" of Barringer's declaration, plaintiff posits that the "Ministerial Religious Calendar . . . actually did state that in 2015: 'NOI offenders observe Friday as a day of worship.'" Id. at 7 (quoting Dkt. No. 44-4 at 46).  Plaintiff also avers that defendants are incorrect insofar as they argue that Supt. Martuscello was not made aware of the issue concerning NOI Jumu'ah services until November 2015, because he "received a carbon copy of . . . McCoy's letter dated June 19, 2015, which put [him] on notice of the ongoing issues of the lack of NOI adherents not having a mandated weekly Jum[u]'ah service." Id. at 6.

Plaintiff further states that both the DOCCS Religious Holy Day Calendar and the Coxsackie Special Events Calendar scheduled for the NOI "to celebrate [S]aviour's [D]ay on October 7, 2015." Dkt. No. 50-1 at 7 (citing Dkt. No. 44-4 at 10, 46).  Plaintiff contends that, contrary to defendants' assertions, Father Reddie did not contact Barringer regarding rescheduling the October 2015 Saviour's Day event prior to October 7, 2015, but rather, Father Reddie did not contact Barringer until October 19, 2015—as evidenced by Father Reddie's memorandum which contains the latter date. See id. at 7-8 (citing Dkt. No. 44-5 at 14).  Plaintiff notes that, during the October 6, 2015 NOI study class, Father Reddie "conferred with the NOI inmates that the event was not scheduled according to its designated day." Id.

Plaintiff points out that none of the named defendants contacted DOCCS Central Office to obtain the required approval to reschedule the October 2015 Saviour's Day event.  Dkt. No. 50-1 at 8.  Plaintiff cites to DOCCS Directive No. 4202 § VII(A), which

23

governs the scheduling of celebrations or observances of religious holy days and provides, in relevant part, that such days "should be noted on a facility events calendar so that all groups are afforded the designated accommodations" and that "[t]here should be no deviation from these instructions without Central Office approval."  Dkt. No. 44-4 at 18 (containing DOCCS Directive No. 4202).  Moreover, DOCCS Directive No. 4202 § VII(B) provides that "[i]t is the responsibility of the designated Chaplain to schedule [celebrations or observations of religious holy days] and to document requests for attendance.  Where a particular faith is not represented by a facility Chaplain, these responsibilities rest with the Coordinating Chaplain . . . ."  Id.  Plaintiff also points to the CORC's decision concerning consolidated Grievance No. CX-18698-15 in support of his contention that the rescheduling of the event violated his constitutional rights under the First Amendment, as the October 2015 Savior's Day event had been rescheduled without notification to the Division of Ministerial, Family and Volunteer Services, as required by DOCCS Directive No. 4202.  Dkt. No. 1-1 at 17.

Plaintiff opposes defendants' arguments concerning personal involvement.  See Dkt. No. 50-1 at 11-16.  Plaintiff states that, after learning of the ongoing issue concerning NOI Jumu'ah services in June 2015, from McCoy's letter, Supt. Martuscello "failed to remedy the wrong."  Id. at 12.  Plaintiff also contends that Supt. Martuscello was personally involved with the decision to reschedule Saviour's Day because "[i]t was [his] responsibility and duty as [s]uperintendent to contact DMFVS in Central Office to receive the approval [to] . . . reschedul[e] and he failed to uphold his duty in protecting [plaintiff's] First Amendment right . . . ."  Id.  Plaintiff also contends that Barringer and

Father Reddie were aware of the lack of Jumu'ah services prior to November 2015, but failed to take corrective action. See id. at 12-15.

Moreover, plaintiff asserts that defendants are not entitled to dismissal of his Equal Protection claims because other religious groups at Coxsackie C.F. were afforded weekly worship services, whereas the NOI was not, despite the "2015 Ministerial Services Religious Calendar" expressly stating that "NOI offenders observe Friday as a day of worship." Dkt. No. 50-1 at 18. In addition, plaintiff argues that defendants have not proffered any evidence to establish that "legitimate penological justifications [existed to] postpone[ the] October 7, 2015 Sabiour's [sic] Day and not to hold weekly Jumu'ah services from May 2015 through December 2015." Id. at 19. Plaintiff also contends that, because defendants violated his First Amendment rights they are not entitled to qualified immunity. See id. Finally, plaintiff avers that, contrary to defendants' contention, he "does make a claim of NOI weekly Jumu'ah services being held at the wrong time . . . ." Id. at 20. Plaintiff further controverts defendants' position that Jumu'ah services can be held "from 10:30 a.m. to 11:30 a.m." because doing so at Coxsackie C.F. "is impossible" as the facility "does a mandated facility inmate count . . . from 10:30 a.m. to 11:00 a.m." Id. at 19. Rather, plaintiff states, "NOI Jumu'ah services should be scheduled from 12 p.m. to 2 p.m.," "as the Orthodox Muslims" are afforded. Id.

### C. Defendants' Reply

Defendants state that plaintiff's reliance on McCoy's June 19, 2015 letter to establish that Supt. Martuscello was put on notice of the lack of Jumu'ah services for

NOI inmates in 2015 by being cc'd on that letter is misplaced, because that letter does "not specifically identify the lack of Jumu'ah services for NOI adherents." Dkt. No. 51 at 1. Further, defendants note that plaintiff's citation to Exhibit 3 of Barringer's declaration in reference to the Ministerial Services Religious Calendar is inaccurate, as the correct citation to the Coxsackie Ministerial Services Calendar is Exhibit 4 to Barringer's declaration. Id. at 2. Moreover, defendants note that the quote, "NOI offenders observe Friday as a day of worship" is, in fact, contained in the 2015 DOCCS Central Office Religious Holy Day Calendar—not the Coxsackie Ministerial Calendar—which did not provide for Jumu'ah services for NOI inmates in 2015. See id. (quoting Dkt. No. 44-4 at 46). In addition, defendants note that, although plaintiff contends that Supt. Martuscello failed to remedy the lack of Jumu'ah services in November 2015, plaintiff acknowledges that steps were taken to accommodate the NOI following the October 2015 consolidated grievance and that Central Office approval was necessary to accommodate their request. See id. at 2.

### III. Legal Standard [11]

Summary judgment may be granted only if the submissions of the parties taken together "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986). "The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists." Price v. Oropallo, No. 9:13-CV-

---

[11] All unpublished opinions cited in this Report-Recommendation and Order, unless otherwise noted, have been provided to plaintiff.

0563 (GTS/TWD), 2014 WL 4146276, at *4 (N.D.N.Y. Aug. 19, 2014) (citing Salahuddin v. Goord, 467 F.3d 263, 272-73 (2d Cir. 2006)).  Facts are material if they may affect the outcome of the case as determined by substantive law.  See Anderson, 477 U.S. at 248.  A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.  "In determining whether summary judgment is appropriate, [the Court will] resolve all ambiguities and draw all reasonable inferences against the moving party."  Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir.1997).

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist.  See Salahuddin, 467 F.3d at 272-73.  The nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact."  Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998).

A party opposing summary judgment is required to submit admissible evidence.  See Spiegel v. Schulmann, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] . . . may rely only on admissible evidence.") (internal quotation marks and citation omitted).  "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment."  Bickerstaff v. Vassar Coll., 196 F.3d 435, 452 (2d Cir. 1999).  "'The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence

on which the jury could *reasonably* find for the plaintiff.'"  Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005) (brackets omitted) (quoting Anderson, 477 U.S. at 252).

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude.  See Treistman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006).  As the Second Circuit stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to special solicitude, that a *pro se* litigant's submissions must be construed liberally, and that such submissions must be read to raise the strongest arguments that they suggest.  At the same time, our cases have also indicated that we cannot read into *pro se* submissions claims that are not consistent with the *pro se* litigant's allegations, or arguments that the submissions themselves do not suggest, that we should not excuse frivolous or vexatious filings by *pro se* litigants, and that *pro se* status does not exempt a party from compliance with relevant rules of procedural and substantive law . . . .

Id. (internal quotation marks, citations, and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district courts that when [a] plaintiff proceeds *pro se*, . . . a court is obligated to construe his pleadings liberally.") (internal quotation marks and citations omitted).

## IV. Discussion

### A. Personal Involvement

"It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield,

950 F.2d 880, 885 (2d Cir. 1991)).  In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered."  Bass v. Jackson, 790 F.2d 260, 263 (2d Cir. 1986).  "[D]irect participation as a basis of liability in this context requires intentional participation in the conduct constituting a violation of the victim's rights by one who knew of the facts rendering it illegal."  Provost v. City of Newburgh, 262 F.3d 146, 155 (2d Cir. 2001) (internal quotation marks omitted).

Courts in this circuit routinely hold that "the doctrine of *respondeat superior* cannot be applied to section 1983 actions to satisfy the prerequisite of personal involvement.  Therefore, a prison official may not be found liable for a constitutional violation merely because of the acts of those under his control."  Kinch v. Artuz, No. 97-CV-2419 (LAP), 1997 WL 576038, at *2 (S.D.N.Y. Sept. 15, 1997) (citing Colon v. Coughlin, 58 F.3d 865, 874 (2d Cir. 1995) and Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994)).  Thus, supervisory officials may not be held liable for their subordinates' constitutional violations merely because they are in a position of authority.  See Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996); see also Colon, 58 F.3d at 874 (holding that the fact that the defendant occupied a high-ranking position in the New York prison hierarchy, without more, was insufficient to establish personal involvement).  Prior to deciding Ashcroft v. Iqbal, 556 U.S. 62 (2009), the Second Circuit held that supervisory personnel may be considered "personally involved" only if

> (1) the defendant participated directly in the alleged constitutional violation;
>
> (2) the defendant, after being informed of the violation through report or appeal, failed to remedy the wrong;

> (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;
>
> (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or
>
> (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon, 58 F.3d at 873 (citing Wright, 21 F.3d at 501 (additional citation omitted)).

In Tangreti v. Bachmann, 983 F.3d 609 (2d Cir. 2020), the Second Circuit addressed how the Supreme Court's decision in Iqbal affected the standards in Colon for establishing supervisory liability.  Consistent with other circuits, the Second Circuit concluded that "there is no special rule for supervisory liability," and held that a "plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, had violated the Constitution.'"  Id. at 618.[12]  The Second Circuit explained that, "'the factors necessary to establish a [§ 1983] violation will vary with the constitutional provision at issue' because the elements of different constitutional violations vary.  The violation must be established against the supervisory official directly."  Id. (quoting Iqbal, 556 U.S. at 676).  "District courts discussing *Tangreti* agree that the decision invalidated the *Colon* test and mandates that a plaintiff must establish a violation against the supervisory official directly."  Fabrizio v. Smith, No. 9:20-CV-0011 (GTS/ML), 2021 WL 2211206, at *10 (N.D.N.Y. Mar. 10, 2021) (collecting cases), report

---

[12]  Prior to Tangreti, Various courts in the Second Circuit have postulated how, if at all, the Iqbal decision affected the five Colon factors which were traditionally used to determine personal involvement.  Pearce v. Estate of Longo, 766 F. Supp. 2d 367, 376 (N.D.N.Y. 2011) (recognizing that several District Courts in the Second Circuit have debated Iqbal's impact on the five Colon factors), rev'd in part on other grounds sub nom., Pearce v. Labella, 473 F. App'x 16 (2d Cir. 2012) (summary order); Kleehammer v. Monroe Cnty., 743 F. Supp. 2d 175, 185 (W.D.N.Y. 2010) (holding that "[o]nly the first and part of the third Colon categories pass Iqbal's muster . . . ."); D'Olimpio v. Crisafi, 718 F. Supp. 2d 340, 347 (S.D.N.Y. 2010) (disagreeing that Iqbal eliminated Colon's personal involvement standard).

and recommendation adopted, No. 9:20-CV-0011 (GTS/ML), 2021 WL 2211023
(N.D.N.Y. June 1, 2021).

### 1. Free Exercise Claims Regarding Lack of Jumu'ah Services in 2015

#### a. Father Reddie

The undersigned concludes that the same rationale applied in Cantey is
applicable to the present matter and that Father Reddie cannot be considered to have
been personally involved in the denial of Jumu'ah services in 2015 because he "lacked
the ability to offer [p]lainitff Jumu'ah services[]" not already in place at Coxsackie C.F. at
that time. Cantey, 2020 WL 1030646, at *6. Pursuant to DOCCS Directive No. 4202,
the facility superintendent—not a chaplain or coordinating chaplain like Father Reddie—
has the authority to determine inmate requests to observe congregational worship
services. See DOCCS Directive No. 4202 § VI(B)(2) (reproduced in Dkt, No. 44-4 at
16). Here, as in Cantey, plaintiff did not "submit[] any evidence suggesting that [Father]
Reddie was in a supervisory role such that he could affect the . . . superintendent's
decision to provide [the p]laintiff with Jumu'ah services." Cantey, 2020 WL 1030646, at
*6. Indeed, even if, as plaintiff suggests, Father Reddie was made aware of Hill's June
19, 2015 request for Jumu'ah services for NOI, he had, at most, the authority to
coordinate religious services that were already provided by the facility—of which
Jumu'ah for NOI was not included in 2015—but not to implement the provision of new
services in the first instance. See id.; see also Rose v. Annucci, No. 9:16-CV-787
(BKS/ATB), 2018 WL 2729259, at *7 (N.D.N.Y. Apr. 19, 2018) (granting the defendants'
motion for summary judgment and dismissing the pro se inmate's 1983 claim for lack of

personal involvement where the "[p]laintiff's allegations d[id] not suggest that [the] defendant . . ., who coordinated food orders for religious meals, had any role in determining which inmates were eligible to attend those meals."), report and recommendation adopted by No. 16-CV-787 (BKS/ATB), 2018 WL 2727874 (N.D.N.Y. June 6, 2018).  Accordingly, it is recommended that plaintiff's First Amendment Free Exercise Clause claim against Father Reddie based on the lack of Jumu'ah services in 2015 be dismissed for lack of personal involvement.

### b. Supt. Martuscello and Barringer

It is undisputed that both Supt. Martuscello and Barringer were, at all times relevant to the claims in this action, supervisory officials.  See Dkt. No. 44-4 at 1 ¶ 2 (Barringer declaration: "As Deputy Supervisor of Programs at Coxsackie, my duties included generally overseeing religious programs at the facility."); Dkt. No. 44-6 at 1 ¶ 1 (Supt. Martuscello declaration: "I am the former Superintendent of Coxsackie [C.F.]  I held that position from April 2010 to my retirement in January 2018, including all times relevant to the claims in this matter.").  First, with respect to Supt. Martuscello, plaintiff's opposition to defendants' motion for summary judgment makes clear that his basis for establishing Supt. Martuscello's personal involvement is that, after learning of the ongoing issue concerning NOI Jumu'ah services in June 2015, from McCoy's letter, Supt. Martuscello "failed to remedy the wrong."  Dkt. No. 50-1 at 12.  However, in light of the Second Circuit's decision in Tangreti, "[p]laintifff's attempt[] to couch [Supt. Martuscello's] liability within the now-overruled scope of supervisory liability as set forth in *Colon*" is insufficient to establish his personal involvement.  Fabrizio, 2021 WL

32

2211206, at *10.  Indeed, as the foregoing makes clear, plaintiff only speculated that Supt. Martuscello was aware of the lack of Jumu'ah services for NOI prior to the October 19, 2015 consolidated grievance (Grievance No. CX-18704-15), but no evidence, admissible or otherwise, indicates that NOI inmates were deprived of Jumu'ah services in 2015 based on Supt. Martuscello's "own individual actions[.]" Tangreti, 983 F.3d at 616.  In any event, as defendants observe, McCoy's June 19, 2015 letter did "not specifically identify the lack of Jumu'ah services for NOI adherents." Dkt. No. 51 at 1; see Dkt. No. 20-1 at 3.

Moreover, even applying the now-invalid Colon standard, plaintiff cannot establish Supt. Martuscello's or Barringer's personal involvement.  First, plaintiff's reliance on the fact that Supt. Martuscello and Barringer were cc'd on McCoy's response is insufficient to establish his personal involvement with a constitutional violation.  See Ramrattan v. Fischer, No. 13-CV-6890 (KPF), 2015 WL 3604242, at *11 (S.D.N.Y. June 9, 2015) ("[A]lleging that the[] Defendants received and reviewed letters and grievances, or even that they denied the relief sought in grievances, is not enough to plead their personal involvement."); Jones v. Fischer, No. 11-CV-774, 2013 WL 4039377, at *10 (N.D.N.Y. Aug. 7, 2013) ("[R]eceipt of a letter . . ., without personally investigating or acting on [it], is insufficient to establish personal involvement.").  In addition, although Supt. Martuscello and Barringer were cc'd on Hill's undated letter, non-party McCoy—not Supt. Martuscello or Barringer—responded to that letter.  See Dkt. No. 20-1 at 2-3.  Thus, as neither Supt. Martuscello nor Barringer responded to inmate Hill's undated 2015 letter, plaintiff may not establish the personal involvement of those supervisory officials based solely on the fact that they were cc'd on that letter.

See Rodriguez v. Rock, No. 9:13-CV-01106 (DNH), 2015 WL 5147045, at *6 (N.D.N.Y. Sept. 1, 2015) ("[I]t is well-established that a supervisor's failure to respond to a letter of complaint does not provide a sufficient basis to find that the defendant was personally involved in the deprivation alleged."); Jean-Laurent v. Lane, No. 9:11-CV-186 (NAM/TWD), 2013 WL 600213, at *16 (N.D.N.Y. Jan. 24, 2013) ("[M]ere receipt of a report or complaint or request for an investigation by a prison official is insufficient to hold the official liable for the alleged constitutional violations."), report and recommendation adopted, No. 9:11-CV-186 (NAM/TWD), 2013 WL 599893 (N.D.N.Y. Feb. 15, 2013); Walker v. Pataro, No. 99-CV-4607(GBD/AJP), 2002 WL 664040, at *12 (S.D.N.Y. Apr. 23, 2002) ("[I]f mere receipt of a letter or similar complaint were enough, without more, to constitute personal involvement, it would result in liability merely for being a supervisor, which is contrary to the black-letter law that § 1983 does not impose respondeat superior liability.").

Furthermore, DOCCS Directive No. 4202 provides that Supt. Martuscello, as Superintendent, "in consultation with the assigned Chaplain for the affected faith group and the Director of MFVS or designee, shall resolve any conflicts pertaining to the scheduling and conduct of worship services."  DOCCS Directive No. 4202 at VI(B)(5) (reproduced at Dkt. No. 44-4 at 18).  Here, the complaint, even liberally construed does not allege, and the summary judgment record does not establish, that any such consultation occurred between Supt. Martuscello and Father Reddie and/or Barringer; rather, the record contains, at most, plaintiff's speculative deposition testimony that plaintiff "assume[d] that [Supt. Martuscello] spoke to Father Reddie or . . . Barringer who brought it to his attention."  Dkt. No. 44-3 at 58; See Raymond v. City of New York, No.

15-CV-6885 (LTS/HBP), 2017 WL 892350, at *5 (S.D.N.Y. Mar. 6, 2017) ("[The] [p]laintiffs' allegations that the [i]ndividual [d]efendants knew or should have known of the customs, practices, and polices described in the [a]mended [c]omplaint . . . and condoned, ratified and/or authorized such practices and policies . . .  are insufficient to allege plausibly the [i]ndividual [d]efendants' [personal involvement]." (alterations, citations, and internal quotation marks omitted)).  At most, the evidence establishes that, once Supt. Martuscello became aware of the Jumu'ah issue in October 2015, he "promptly asked    . . . Barringer to reach out to DOCCS Central Office to ascertain whether the NOI could have their congregate services on Friday mornings[,] Dkt. No. 44-6 at ¶ 18, which Barringer did.  Thus, Supt. Martuscello's and Barringer's direct actions resulted in the acquisition of Jumu'ah services—not a deprivation thereof.  Any delay between Supt. Martuscello's review of consolidated grievance concerning Jumu'ah and Barringer's request for the approval of such services and the approval of Jumu'ah services for NOI inmates at Coxsackie was due to the time DOCCS personnel took to approve those services for the following calendar year—and not the direct actions of Supt. Martuscello or Barringer.

Based on the foregoing, it is recommended that plaintiff's First Amendment claim concerning the provision of Jumu'ah services in 2015 be dismissed as to all defendants for lack of personal involvement.


**2. Supt. Martuscello's Personal Involvement in Rescheduling Saviour's Day 2015**

The undersigned reaches a similar conclusion with respect to defendants' argument that Supt. Martuscello was not personally involved in the rescheduling of the

October 2015 Saviour's Day event.  See Dkt. No. 44-1 at 13.  First, Supt. Martuscello states in his declaration that he "had no direct involvement in rescheduling the [October 2015] Saviour's Day" event.  Dkt. No. 44-6 at 2 ¶ 4.  As defendants have explained, the evidence before the undersigned establishes that the decision to reschedule this event was made by Father Reddie and Barringer.  See Dkt. No. 44-4 at 2 ¶ 6; Dkt. No. 44-5 at 2 ¶ 5.  In addition, defendants have established that Supt. Martuscello did not investigate or issue a decision on plaintiff's appeal of the consolidated grievance relating to the rescheduling of the October 2015 Saviour's Day event (Grievance No. CX-18698-15), but rather, designated that grievance to Deputy Supt. Lotz who issued the decision.  See Dkt. No. 44-1 at 13; Dkt. No. 44-6 at 3 ¶ 8.  In support, defendants proffer Deputy Supt. Lotz's signed decision on Grievance No. CX-18698-15.  See Dkt. No. 44-6 at 18.  The assignment of Grievance No. CX-18698-15 to Deputy Supt. Lotz is insufficient to establish Supt. Martuscello's personal involvement with respect thereto. See Toliver v. Fisher, 9:12-CV-00077 (MAD/ATB), 2015 WL 403133, at *16 (N.D.N.Y. Jan. 29. 2015) ("By delegating the investigation of this grievance to Sgt. Lutz and merely reporting Sgt. Lutz's findings in his letter to [the]plaintiff, defendant Maly did not become personally involved in any alleged constitutional violation.").  Plaintiff has not proffered any admissible evidence to raise a genuine issue of fact in this regard, and his conclusory assertions in opposition are insufficient to defeat defendants' documentary case.  See Flaherty v. Coughlin, 713 F.2d at 13.  Thus, it is recommended that defendants' motion in this regard be granted and plaintiff's First Amendment Free Exercise Clause claim against Supt. Martuscello based on the rescheduling of the October 2015 Saviour's Day event be dismissed for lack of personal involvement.

36

**B. Free Exercise Claim Concerning the Rescheduling of the October 2015 Saviour's Day Asserted Against Father Reddie and Barringer**

**1. Merits**

The First Amendment to the United States Constitution guarantees the right to free exercise of religion.  See U.S. CONST. amend. I; Cutter v. Wilkinson, 544 U.S. 709, 719 (2005).  As is true with regard to the First Amendment generally, the free exercise clause applies to prison inmates, subject to appropriate limiting factors.  See Ford v. McGinnis, 352 F.3d 582, 588 (2d Cir.2003) ("Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." (citing Pell v. Procunier, 417 U.S. 817, 822 (1974)).  Thus, for example, under accepted free exercise jurisprudence, inmates are guaranteed the right to participate in congregate religious services under most circumstances.  See, e.g., Salahuddin v. Coughlin, 993 F.2d 306, 308 (2d Cir.1993) (citing cases).

The right of prison inmates to exercise their religious beliefs, however, is not absolute or unbridled, but instead is subject to valid penological concerns, including those relating to institutional security.  See O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987); Salahuddin, 993 F.2d at 308.  For example, a determination of whether an inmate's constitutional rights have been infringed by the refusal to permit his attendance at a religious service hinges upon the balancing of the inmate's First Amendment free exercise right against the institutional needs of officials tasked with the increasingly daunting task of operating prison facilities.  This determination is "one of reasonableness, taking into account whether the particular [act] affecting [the] constitutional right . . . is 'reasonably related to legitimate penological interests.' "

37

Benjamin v. Coughlin, 905 F.2d 571, 574 (2d Cir.1990) (quoting Turner v. Safley, 482 U.S. 78, 89 (1987)).

A prisoner bringing a free exercise claim has the initial burden of establishing "that the disputed conduct substantially burdens his sincerely held religious beliefs." Salahuddin, 467 F.3d at 274-75.  The burden then shifts to the defendants to identify legitimate penological interests which justify the restriction of the plaintiff's free exercise rights.  See id. at 275.  The burden on the defendants in this situation is "relatively limited" and the burden remains on the plaintiff to establish that the identified penological interests are irrational or illegitimate.  Id.; see Ford, 352 F.3d at 595.

The court must then determine if the challenged regulation or decision is reasonable based on the following four factors:

> [1] whether the challenged regulation or official action has a valid, rational connection to a legitimate governmental objective; [2] whether prisoners have alternative means of exercising the burdened right; [3] the impact on guards, inmates, and prison resources of accommodating the right; and [4] the existence of alternative means of facilitating exercise of the right that have only a de minimis adverse effect on valid penological interests.

Salahuddin, 467 F.3d at 274 (citing Turner, 482 U.S. at 90-91) (footnote omitted).  As the Second Circuit made clear in Salahuddin, "[t]he first . . . 'factor' is more properly labeled an 'element' because it is not simply a consideration to be weighed by rather an essential requirement."  Id. (citations omitted).

Here, as stated above, defendants do not controvert Father Reddie's and Barringer's personal involvement in the decision to reschedule the October 2015 Saviour's Day celebration.  See Dkt. No. 44-1 at 14, 15.  Further, because defendants do not challenge the sincerity of plaintiff's beliefs, see Dkt. No. 44-1 at 16, the

undersigned will first assess whether defendants have satisfied their burden of identifying legitimate penological interests in rescheduling the October 2015 Saviour's Day event. See Salahuddin, 467 F.3d at 275.

Defendants contend that Father Reddie and Barringer agreed to reschedule the event due to "a lack of space at Coxsackie for the large number of events scheduled for October 7, 2015." Dkt. No. 44-1 at 9; see Dkt. No. 44-4 at 2 ¶ 6; Dkt. No. 44-5 at 2 ¶¶ 5-6. However, as in Cantey, defendants here have failed to establish how rescheduling Saviour's Day "served to deter crime, rehabilitate prisoners, protect institutional security, or meet any other penological goal." Cantey, 2019 WL 1397006, at *8. Indeed, a review of defendants' documentary evidence demonstrates that the 2015 Coxsackie C.F. Special Events Calendar listed only two events on October 7—NOI's Saviour's Day and the Rastafarian event for Negust Day. See Dkt. No. 44-4 at 10. Notably, these events were scheduled to take place in separate areas of the facility, with the NOI's Saviour's Day event to take place in the School Annex and the Negust Day event to be held in the Chapel/Annex. See id. Moreover, although Father Reddie was listed as the Coordinating Chaplain for both NOI and Rastafarian inmates on the 2013 Coxsackie C.F. Ministerial Calendar, see id. at 78, and the events overlapped by two hours with the Saviour's Day event scheduled from 12:30 p.m. to 5:30 p.m. and Negust Day scheduled from 8:30 a.m. to 2:30 p.m.—defendants do not argue that Saviour's Day was rescheduled due to a conflict in Father Reddie's schedule. See Dkt. No. 44-1 at 15, 17-18. Thus, the undersigned concludes that defendants have failed to meet their burden of establishing that the October 2015 Savior's Day event was rescheduled for a legitimate penological interest. See Salahuddin, 467 F.3d at 274-75.

## 2. Qualified Immunity

As an additional matter, defendants contend that they are entitled to summary judgment based on qualified immunity as to plaintiff's free exercise claim relating to the cancellation of the October 2015 Saviour's Day event because it was rescheduled and other NOI inmates attended the rescheduled event.  See Dkt. No. 44-1 at 21.  Defendants do not controvert that plaintiff had a clearly established right to celebrate Saviour's Day on October 7, 2015.  See Dkt. No. 44-1 at 21.  Indeed, the 2015 Coxsackie Special Events Calendar establishes that October 7, 2015, was the day designated for NOI inmates to celebrate one of the two annual Saviour's Day events, a Muslim religious holiday to celebrate the birthday of Muhammed.  Dkt. No. 44-4 at 10.

As discussed above, defendants have failed to establish that a legitimate penological justification existed for rescheduling the October 2015 Saviour's Day event.  See subsection IV.B.1., supra.  "The Second Circuit has held that qualified immunity is not appropriate at the summary judgment stage where genuine issues of material fact exist as to whether defendants had legitimate penological justifications for denying plaintiffs certain opportunities for religious exercise."  Pugh v. Goord, 571 F. Supp. 2d 477, 512 (S.D.N.Y. 2008) (citing Salhuddin, 467 F.3d at 275-76).  Consequently, it is recommended that defendants' motion be denied insofar as it seeks summary judgment dismissing plaintiff's First Amendment Free Exercise Clause claim against Father Reddie and Barringer concerning the rescheduling of the October 2015 Saviour's Day event based on qualified immunity.

**C. First Amendment Free Exercise Claim Regarding the Scheduling of Jumu'ah Services in 2016**

The undersigned concludes that defendants have established entitlement to summary judgment dismissing plaintiff's First Amendment religious claim regarding the scheduled time of Jumu'ah services in 2016. As an initial matter, aside from plaintiff's contentions, see Compl. at 6; Dkt. No. 44-6 at 50-51, the evidence contained in the summary judgment record does not establish that Jumu'ah must be celebrated on Friday afternoon instead of Friday morning. Plaintiff's proffer of Qur'an 62:9-10, and the 2015 DOCCS Religious Holy Day Calendar, establish only that NOI adherents celebrate Jumu'ah services on Fridays, but state nothing as to the time that service must be held. See Dkt. No. 1-1 at 10; Dkt. No. 44-4 at 46. In addition, as defendants note, plaintiff testified equivocally with respect to the timing of Jumu'ah prayer, stating that it is generally held between noon and 2:00 p.m., but that "during the springtime, summertime, the hours will go up and the hours will go back," so that the appropriate time to hold the Jumu'ah service would be "maybe about twelve—twelve thirty to one o'clock. But when the time goes back, it would be within the ten thirty to eleven thirty range." Dkt. No. 44-3 at 31. Plaintiff's only contention in opposition to defendants' reference to his deposition testimony in this regard misses the point, as he exclusively addresses the fact that Jumu'ah services could not be held "from 10:30 a.m. to 11:30 a.m." at Coxsackie C.F. because the facility "does a mandated . . . inmate count . . . from 10:30 a.m. to 11:00 a.m." Dkt. No. 50-1 at 19.

Even assuming that plaintiff has established that holding Jumu'ah services on Friday mornings instead of Friday afternoons constituted a substantial burden on his sincerely held religious beliefs, defendants have established that a legitimate

penological reason justified holding NOI Jumu'ah services on Friday mornings.  As defendants note, Barringer's November 30, 2015 email to Imam Ahmed Muhammad at DOCCS Central Office, indicated that Coxsackie C.F. wanted to ensure that "a chaplain [would be] in the area when we hold NOI services" and asked that, "[s]ince Imam Ali holds Muslim Services on Friday afternoons, can we hold NOI Services on Friday mornings?"  Dkt. No. 44-4 at 80.  Indeed, it has been held that "the requirement that religious programming be supervised by facility chaplains . . . is rationally related to the penological interest in safety and security of the facility."  Persad v. Savage, No. 02-CV-336S (WMS/LGF), 2004 WL 1570286, at *4 (W.D.N.Y. May 25, 2004), report and recommendation adopted, No. 02-CV-336S (WMS/LGF), 2004 WL 1858140 (W.D.N.Y. Aug. 19, 2004).  Plaintiff has not offered any compelling argument or proffered any evidence to establish that this identified penological interest was irrational or illegitimate. See Salahuddin, 467 F.3d at 275.  Furthermore, alternatives for observing Jumu'ah services on Friday afternoons were provided for NOI inmates, as they were afforded weekly Jumu'ah services on Friday morning.  Consequently, it is recommended that plaintiff's free exercise claim concerning the timing of Jumu'ah services in 2016 be dismissed.  See Persad, 2004 WL 1570286, at *5 (holding that prison policy of allowing congregate prayer services only with the supervision of a state-approved supervisor "satisfie[d] the Turner factors, and [wa]s not an unconstitutional infringement on the [p]laintiffs' First Amendment right to the free exercise of religion.").

## D. Fourteenth Amendment Equal Protection

### 1. Lack of Jumu'ah Services in 2015

The Fourteenth Amendment's Equal Protection Clause mandates equal treatment under the law.  U.S. CONST. amend. XIV, § 1.  Essential to that protection is the guarantee that similarly-situated persons be treated equally.  See City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985). "To prove a violation of the Equal Protection Clause . . . a plaintiff must demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination." Phillips v. Girdich, 408 F.3d 124, 129 (2d Cir. 2005).

> [T]he Equal Protection Clause bars the government from selective adverse treatment of individuals compared with other similarly situated individuals if such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.

Vegas v. Artus, 610 F. Supp. 2d 185, 209 (N.D.N.Y. 2009) (internal quotation marks and citations omitted).  To succeed, a plaintiff must show "that [he was] intentionally treated differently from other similarly-situated individuals without any rational basis."  Clubside, Inc. v. Valentin, 468 F.3d 144, 158-59 (2d Cir. 2006); see Ramsey v. Goord, 661 F. Supp. 2d 370, 397 (W.D.N.Y. 2009) ("Establishment of an equal protection violation requires the plaintiff show purposeful discrimination directed at an identifiable suspect class." (internal quotation marks and citation omitted)).

Here, the record is devoid of admissible evidence to support plaintiff's claim that defendants acted intentionally or purposefully to deprive him and NOI inmates of participating in Jumu'ah services while providing such services for Orthodox Muslims. See Compl. at 6, 7, 9.  In support of their motion, defendants have proffered admissible evidence—declarations signed under penalty of perjury—establishing that they did not

43

take any adverse actions with respect to plaintiff on the basis of his religious affiliation. <u>See</u> Dkt. No. 44-4 at 4 ¶ 9; Dkt. No. 44-5 at 4 ¶ 12; Dkt. No. 44-6 at 7 ¶ 27.  In opposition, plaintiff argues only that defendants are not entitled to dismissal of his Equal Protection claims because other religious groups at Coxsackie C.F. were afforded weekly worship services, whereas the NOI was not, despite the "2015 Ministerial Services Religious Calendar" expressly stating that "NOI offenders observe Friday as a day of worship."  Dkt. No. 50-1 at 18.  As defendants point out in reply, plaintiff confuses the Coxsackie C.F. Ministerial Services Calendar—which did not provide such services—with the 2015 DOCCS Central Office Religious Holy Day Calendar.  <u>See</u> Dkt. No. 51 at 2.  Moreover, plaintiff's assertions that any unequal treatment was intentional are conclusory and unsupported by any record evidence.  <u>See</u> <u>Reynolds v. Barrett</u>, 685 F.3d 193, 201 (2d Cir. 2012) ("'[A] plaintiff pursuing a claimed . . . denial of equal protection under § 1983 must show that the discrimination was intentional.'" (quoting <u>Patterson v. Cnty. of Oneida</u>, 375 F.3d 206, 226 (2d Cir. 2004)).  In any event, the undisputed facts cut against plaintiff's theory of intentional discrimination, as Supt. Martuscello and Barringer resolved the issue of the lack of Jumu'ah services for NOI inmates promptly after Supt. Martuscello reviewed plaintiff's October 19, 2015 consolidated grievance and commissioned Barringer to obtain approval from DOCCS Central Office to provide that service to NOI inmates a Coxsackie.  <u>See</u> Dkt. No. 1-1 at 25; Dkt. No. 44-6 at 5 ¶ 18.  Accordingly, it is recommended that defendants' motion for summary judgment be granted and plaintiff's Equal Protection claim based on the lack of Jumu'ah services in 2015 be dismissed.

### ***2.*** **Remaining Equal Protection Claims**

Plaintiff asserts that defendants violated his rights under the Equal Protection Clause by failing to provide NOI inmates the ability to shower before Jumu'ah services, despite allowing Sunni Muslims to shower prior to their Jumu'ah service.  See Compl. at 6, 7; Dkt. No. 44-6 at 50, 51.  As an initial matter, the undersigned notes that, in the December 9, 2019 Report-Recommendation, which was adopted in its entirety in the Court's January 13, 2020 Memorandum-Decision & Order, plaintiff's First Amendment Free Exercise Clause claim—premised on the same facts—was dismissed for failure to state a claim.  See Dkt. No. 33 at 23.  Plaintiff has no freestanding right to shower at a particular time separate from any First Amendment right he may have in that regard. Therefore, as the Court previously held that plaintiff failed to establish a First Amendment right to shower before Jumu'ah services—and plaintiff did not file an amended pleading correcting this deficiency—it is recommended that his equal protection claim based thereon be dismissed as derivative and duplicative of his previously dismissed free exercise claim.  See Barnes v. Fedele, 760 F. Supp. 2d 296, 302 (W.D.N.Y. 2011) (dismissing equal protection claim as "derivative and duplicative of" Free Exercise Clause claims).

In addition, plaintiff's reliance on the 2012 memorandum to establish that NOI inmates were previously afforded showers is unpersuasive, as that memorandum necessarily pre-dates any Jumu'ah services for NOI inmates at Coxsackie C.F.—the very basis of numerous causes of action—and plaintiff fails to identify which "services" he posits were previously provided to NOI inmates.  Dkt. No. 44-6 at 50.  In any event, plaintiff does not address the issue of pre-Jumu'ah showers in his opposition to

defendants' motion for summary judgment, see Dkt. No. 50-1 at 19-20, despite defendants' warning of the consequences of failing to respond to their motion.  See Dkt. No. 44 at 3.  Accordingly, in the alternative, it is recommended that plaintiff's claims be dismissed as abandoned.  See Maher v. All. Mortg. Banking Corp., 650 F. Supp. 2d 249, 267 (E.D.N.Y. 2009) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way." (internal quotation marks and citations omitted)); see also Martien v. City of Schenectady, No. 1:04-CV-679 (FJS/RFT), 2006 WL 1555565, at *2 (N.D.N.Y. June 2, 2006) (deeming abandoned and granting summary judgment in favor of the defendant as to a claim that the pro se plaintiff did not address in response to the defendant's motion for summary judgment).

## V. Conclusion

**WHEREFORE**, based on the findings set forth above, it is hereby:

**RECOMMENDED**, that defendants' Motion for Summary Judgment (Dkt. No. 44) be **GRANTED IN PART** and the following of plaintiff's claims be **DISMISSED WITH PREJUDICE**:

(1) First Amendment Free Exercise Clause claim based on lack of Jumu'ah services in 2015 as against all defendants;

(2) First Amendment Free Exercise Clause claim based on the timing of Jumu'ah services in 2016 as against all defendants;

(3) First Amendment Free Exercise Clause claim based on the rescheduling of the October 2015 Saviour's Day celebration insofar as asserted against Supt. Martuscello;

(4) Fourteenth Amendment Equal Protection claims; and it is further

**RECOMMENDED**, that the action be **TERMINATED** as to Supt. Martuscello; and it is further

**RECOMMENDED**, that defendants' partial Motion to Dismiss be **DENIED IN PART** insofar as it seeks dismissal of plaintiff's First Amendment Free Exercise Clause claim based on the rescheduling of the October 2015 Saviour's Day celebration insofar as asserted against Father Reddie and Barringer; and it is further

**ORDERED**, that that the Clerk of the Court serve a copy of this Report-Recommendation and Order on all parties in accordance with Local Rules.

**IT IS SO ORDERED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed R. Civ. P. 6(a), 6(e), 72.[13]

---

[13] If you are proceeding pro se and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Report-Recommendation & Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Id. § 6(a)(1)(C).

Dated: June 21, 2021
　　　　Albany, New York


Christian F. Hummel
U.S. Magistrate Judge